PRECEDENTIAL
UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-2354
_____

PERNOD RICARD USA, LLC,

Appellant

v.

BACARDI U.S.A., INC.
_____

On Appeal from the United States District Court
for the District of Delaware
(D.C. No. 06-cv-505)
District Judge:  Hon. Sue L. Robinson
_____

Argued
February 9, 2011

Before:   JORDAN, GREENAWAY, JR., and WEIS, *Circuit Judges*.

(Filed:  August 4, 2011)
_____

David H. Bernstein   [ARGUED]
Carl J. Micarelli
Debevoise & Plimpton
919 Third Avenue – 41st Fl.
New York, NY  10022

Jack B. Blumenfeld
Rodger D. Smith, II
Morris, Nichols, Arsht & Tunnell
1201 N. Market Street
Wilmington, DE  19801

Eric R. Hubbard
Margaret C. Lu
Vincent N. Palladino
Ropes & Gray
1211 Avenue of the Americas
New York, NY  10036
      *Counsel for Appellant*

Anne S. Gaza
William J. Wade
Richards, Layton & Finger
920 N. King Street
Wilmington, DE   19801

William R. Golden, Jr.   [ARGUED]
Matthew D. Marcotte
Kelley, Drye & Warren
101 Park Avenue
New York, NY  10178
      *Counsel for Appellee*

Richard J. Leighton
Scott M. Abeles
Keller and Heckman LLP
1001 G Street, NW – Ste. 500 West
Washington, DC  20001

Leyla Mujkic
Keller and Heckman LLP
3 Embarcadero Center – Ste. 450
San Francisco, CA   94111

Duane L. Berlin
Lev & Berlin, P.C.
200 Connecticut Avenue – 5th Fl.
Norwalk, CT   06854
        *Counsel for Amicus Appellants*

_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

Pernod Ricard USA, LLC ("Pernod") appeals the decision of the United States District Court for the District of Delaware that the label of "Havana Club" brand rum, a rum sold in the United States by Bacardi U.S.A., Inc. ("Bacardi"), is not a false advertisement of the rum's geographic origin under Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).  Because we agree with the District Court that no reasonable interpretation of the label as a whole could lead to the conclusion that it is false or misleading, we will affirm.

## I.     Background

### A.     *The Original Havana Club Rum and Its Trademark*

This case is the latest battle in a lengthy war between Pernod and Bacardi, two multinational distilleries, over the use of the words "Havana Club" to sell rum in the United States. Though the convoluted history of the conflict has been recounted at length elsewhere, a portion of it requires retelling.[1]

Before the start of the Cuban Revolution, the Arechabala family produced "Havana Club" brand rum in Cuba, sold it locally, and exported it for sale in the United States. In 1960, following the Communist revolution in Cuba, the Cuban government expropriated the Arechabalas' business without compensation. Three years later, the United States began to enforce a trade embargo against Cuba. The embargo, which continues to this day, generally prevents the

---

[1]A more detailed history is provided in *Havana Club Holding, S.A. v. Galleon S.A.*, 203 F.3d 116 (2d Cir. 2000); *Empresa Cubana Exportadora de Alimentos y Productos Varios v. United States Dept. of Treasury*, 606 F. Supp. 2d 59 (D.D.C. 2009) ("*Empresa Cubana*"); *Havana Club Holding, S.A. v. Galleon, S.A.*, 62 F. Supp. 2d 1085 (S.D.N.Y. 1999); *Havana Club Holding, S.A. v. Galleon, S.A.*, 1998 WL 150983 (S.D.N.Y. Mar. 31, 1998); *Havana Club Holding, S.A. v. Galleon, S.A.*, 961 F. Supp. 498 (S.D.N.Y. 1997); *Havana Club Holding, S.A. v. Galleon, S.A.*, 974 F. Supp. 302 (S.D.N.Y. 1997).

importation of Cuban goods and is administered by the Office of Foreign Assets Control ("OFAC"). Despite the embargo, the Cuban government in 1976, through a government-owned company called "Cubaexport,"[2] managed to register with the United States Patent and Trademark Office ("USPTO") the words "Havana Club" as a trademark for use in connection with rum. In 1994, through a series of transfers, the Cuban government assigned its claimed interests in the Arechabala family's old business to a joint venture (the "JV"), of which Pernod Ricard, S.A., Pernod's parent corporation, is a member.[3] That transfer included the USPTO registration for the "Havana Club" mark, and, in 1995, OFAC specifically approved the transfer of the trademark to the JV. However, in 1997, OFAC retroactively revoked its permission for that transfer. The mark then remained registered to Cubaexport until July 2006, when the registration expired after OFAC denied permission for renewal of the mark.

---

[2]The formal name of the enterprise is "Empresa Cubana Exportadora De Alimentos y Productos Varios." (App. at 8.)

[3]Through the JV, rum branded as "Havana Club" is sold outside the United States. Because of the trade embargo, Cuban-made rum cannot be sold in the United States. However, United States citizens traveling to Cuba are permitted to return with a limited amount of Cuban goods, including Havana Club rum made under the auspices of the JV. It has been said that "Havana Club rum and cigars are the most popular items brought back." *Havana Club Holding, S.A. v. Galleon S.A.*, 203 F.3d 116, 121 (2d Cir. 2000).

### B. Bacardi's Sales of Havana Club Brand Rum

In 1994, Bacardi filed a federal trademark application for use of the "Havana Club" mark on rum in the United States,[4] and, for a short time in 1995, Bacardi imported from the Bahamas and sold in this country a nominal amount of rum labeled with that mark. Soon after those limited sales, the JV filed suit in the United States District Court for the Southern District of New York to enjoin Bacardi's use of the "Havana Club" trademark. While that action was pending, Bacardi purchased from the Arechabala family any remaining rights they might have had to the "Havana Club" mark and the related goodwill of the business, along with any rum business assets the family owned. Later, following OFAC's revocation of permission for the transfer of the "Havana Club" mark to the JV in 1997, the JV's case against Bacardi was dismissed. *See Havana Club Holding, S.A. v. Galleon S.A.*, 203 F.3d 116, 121, 135 (2d Cir. 2000).

---

[4]That application is still pending before the USPTO. United States Trademark Application Serial No. 74,572,667 (filed Sept. 12, 1994). Bacardi also filed applications for use of the marks "Havana Select," "Habana Clasico," "Old Havana," "Havana Primo," and "Havana Clipper," in connection with the sale of rum. Registration of those marks was denied, and the Trademark Trial and Appeal Board ("TTAB") affirmed those denials in 1997 on the basis that the marks were "primarily geographically deceptively misdescriptive … because purchasers' belief that the rum products … originate in HAVANA, Cuba, is a mistaken belief." *In re Bacardi & Co. Ltd.*, 48 U.S.P.Q. 2d 1031, 1035 (T.T.A.B. 1997).

6

In August 2006, just days after Cubaexport's federal trademark registration of "Havana Club" expired, Bacardi began selling rum in Florida using "Havana Club" as the brand name. The rum was distilled in Puerto Rico and was made using the Arechabala family recipe.[5] Bacardi took three years to develop the product, due to regulatory and production requirements, and, according to a member of the Arechabala family, it turned out to be "almost identical" to the original Havana Club rum made by the family in Cuba. The bottle in which Bacardi's rum was sold appears below.

---

[5]Before those sales commenced, Bacardi submitted the label for the rum to the Department of the Treasury's Alcohol and Tobacco Tax and Trade Bureau ("T&TB"). The T&TB must approve labeling of alcoholic beverage bottles and is tasked with preventing misleading statements on alcoholic beverage labels. 27 U.S.C. § 205. The T&TB ultimately approved Bacardi's Havana Club rum label in April 2008.

7



On the front of the bottle, the phrase "Havana Club™" appears in large stylized letters, followed by the word "BRAND" in much smaller letters. Below that, in letters of prominent though slightly smaller size than those in the brand name and in a different font, the words "PUERTO RICAN

8

RUM" appear. Beneath that, in smaller letters and different color ink, the label says "HAVANA CLUB™ RUM." The words "Havana Club™" are also repeated several times around the neck of the bottle. The back of the bottle includes a statement in clearly legible type that reads as follows:

> Havana Club™ Rum is a premium rum distilled and crafted in Puerto Rico using the original Arechabala family recipe. Developed in Cuba circa 1930, this finely crafted spirit uses black strap molasses, a slow fermentation process, five times distillation and white oak mellowing to create a velvet smoothness that is clean and round to the palate.

The words "HAVANA CLUB™ RUM" and the web address "www.havanaclubus.com" also appear on the back of the bottle above a government-mandated health warning, which is followed by a toll-free number containing the letters HAVANA and, in small print, the phrases "Produced by Havana Club, U.S.A., San Juan, P.R." and "Havana Club is a trademark."

### C. The Instant Case

In 2006, shortly after Bacardi began its sales of the Havana Club rum made in Puerto Rico, Pernod filed this false advertising suit under Section 43(a)(1)(B) of the Lanham Act, asserting that the labeling of Bacardi's bottle, particularly the use of the words "Havana Club," misleads consumers to believe that the rum is produced in Cuba. At the conclusion of a three-day bench trial, in which Pernod presented unrebutted survey evidence that approximately eighteen

9

percent of consumers who looked at the Havana Club rum bottle were left thinking that the rum was made in Cuba or from Cuban ingredients,[6] the District Court ruled in favor of Bacardi. The Court found that the Havana Club brand name reflected the Cuban heritage of the rum's recipe. According to the Court, Bacardi "has a First Amendment right to accurately portray where its product was historically made and, therefore, plaintiff cannot demonstrate that defendant's use of 'Havana Club' violates … the Lanham Act." (App. at 26.) The District Court also said that, because the "Havana Club label clearly and truthfully provides the origin of [Bacardi]'s rum, and is not deceptive" (App. at 23), there was no need "to analyze actual (or likely) consumer deception" (App. at 27). The District Court thus bypassed Pernod's survey evidence, holding that "[a] court is permitted to find, as a matter of law, that no reasonable consumer could be misled by the challenged advertising." (App. at 23 n.19.)

Pernod timely appealed the District Court's decision on the sole ground that the Court erroneously failed to consider the survey evidence presented by Pernod.

---

[6]Pernod's expert said that his analytical approach included understanding "the percentage of respondents stating that the product was made in either Havana or Cuba and/or that the product's ingredients came from Cuba. These respondents were classified as 'misled.'" (App. at 930.)

10

## II. Discussion[7]

It appears that this false advertising dispute is a proxy for the real fight the parties want to have, which is over the right to the exclusive use of "Havana Club" as a trademark. Under the peculiar circumstances of the Cuban trade embargo and the attendant denial of an opportunity to register and protect "Havana Club" as a mark for rum in the United States, Pernod has turned to the false advertising provision of the Lanham Act, § 43(a)(1)(B).[8] Section 43(a)(1)(B) provides in pertinent part:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof,

---

[7]The District Court had jurisdiction over this action based upon 28 U.S.C. § 1331. We exercise jurisdiction pursuant to 28 U.S.C. § 1291. We review the District Court's findings of fact for clear error and its conclusions of law *de novo*. *Hooven v. Exxon Mobil Corp.*, 465 F.3d 566, 572 (3d Cir. 2006).

[8]This is not the first time the false advertising provision of the Lanham Act has been asked to stand in for a trademark action during the course of the battle over the "Havana Club" mark. In litigation before the United States District Court for the Southern District of New York and the United States Court of Appeals for the Second Circuit, a corporation formed by the JV, Havana Club International, S.A., was pressing a false advertising claim but was held to lack standing because it sold no rum in the United States. *See Havana Club Holding, S.A.*, 203 F.3d at 119, 130-33.

or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which –

…

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125.

To establish a false advertising claim under the Lanham Act, a plaintiff must prove:

1) that the defendant has made false or misleading statements as to his own product [or another's]; 2) that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; 3) that the deception is material in that it is likely to influence purchasing decisions; 4) that the advertised goods traveled in interstate commerce; and 5) that there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc.

*Warner-Lambert v. Breathasure*, 204 F.3d 87, 91-92 (3d Cir. 2000) (citing *Johnson & Johnson-Merck Consumer Pharm. Co. v. Rhone-Poulenc Rorer Pharm., Inc.*, 19 F.3d 125, 129 (3d Cir. 1994)). As to the second element, actual deception or a tendency to deceive is presumed if a plaintiff proves that an advertisement is unambiguous and literally false. *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 586 (3d Cir. 2002). If the message conveyed by an advertisement is literally true or ambiguous, however, the plaintiff must prove actual deception or a tendency to deceive, and it may do so with a properly conducted consumer survey. *Id.* at 586, 588-90; *Rhone-Poulenc Rorer*, 19 F.3d at 129-31.

Pernod submitted a consumer survey at the trial and asserts that the District Court was required to consider it when determining if Bacardi's "Havana Club" label amounted to a misleading statement of geographic origin. According to Pernod, "[r]esolution of the 'pivotal legal question' of whether an advertisement, like Bacardi USA's label, implies an inaccurate message to a sufficient number of consumers 'virtually demands survey research because it centers on consumer perception and memory.'" (Appellant's Op'g Br. at 30 (quoting Fed. Judicial Ctr., *Reference Manual on Scientific Evidence* 235 (2d ed. 2000).) Bacardi responds, in line with the District Court's reasoning, that the initial step in analyzing a statement challenged as false advertising is to "'determine[] what message is conveyed.'" (Appellee's Ans'g Br. at 18 (quoting *United States Healthcare, Inc. v. Blue Cross of Greater Phila.,* 898 F.2d 914, 921 (3d Cir. 1990)).) And, Bacardi emphasizes, our precedent provides that "'[s]ometimes this determination may be made from the

13

advertisement on its face.'" *Id.* (quoting *United States Healthcare,* 898 F.2d at 922).

To address the competing arguments before us, we must first consider the District Court's reasoning in greater detail. The Court admitted Pernod's survey evidence but decided at step one of the analytical process that no false or misleading statement was made, so no survey evidence was needed. Indeed, the Court questioned whether "Havana Club" is even an actionable statement under § 43(a)(1)(B) because "[i]t is not self-evident that … [it is] a statement[] of fact capable of being proven false." (App. at 17 (internal quotation marks and citation omitted).) "Havana Club" is, said the Court, "not the same as 'Made in Havana' or even 'Havana Rum,' such as would impart a specific, verifiable claim." (*Id.*) But, assuming for the sake of analysis that the words "Havana Club" do constitute an actionable statement, the Court turned to what it saw as the "unique question" presented by this case, namely, "is 'geographic origin' more akin to 'heritage' or to the 'source of production'?" (*Id.* at 18.)

After considering the development of the right of action arising from a "false designation of origin" and exploring the meaning of "origin," the District Court discounted the relevance of the precedents it had just reviewed. It drew a distinction between § 43(a)(1)(A), which is the subsection of § 43(a) that is focused on trademarks and, more generally, unfair competition, and § 43(a)(1)(B), which is the subsection at issue here and addresses false advertising. Section 43(a)(1)(A) forbids, among other things, false or misleading representations that may deceive consumers about the "origin" of goods or services, while § 43(a)(1)(B) forbids

14

false or misleading representations as to the "geographic origin" of goods and services. In light of the addition of the modifier "geographic" to the word "origin" in § 43(a)(1)(B), the District Court considered authority regarding § 43(a)(1)(A) to be "not particularly instructive on the meaning of 'geographical origin' as used in § 43(a)(1)(B)." (App. at 21.)

The Court acknowledged that the Supreme Court has held in a § 43(a)(1)(A) case that "origin" refers to "the producer of the tangible goods that are offered for sale, and not the author of any idea, concept, or communication embodied in those goods." *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 37 (2003). "[A]pplying that focus to the interpretation of 'geographical origin,'" the District Court said, "would implicate the place of manufacture, rather than the source of that product's recipe or its heritage." (App. at 21.) Nevertheless, relying on a decision of the Trademark Trial and Appeal Board ("TTAB"), an administrative tribunal in the USPTO, the Court considered it "plausible" that the term "geographic origin" in the false advertising context may be broad enough to embody a product's heritage, including its history and recipe. (*Id.* (citing *Corporacion Habanos, S.A. v. Anncas, Inc.*, 88 U.S.P.Q. 2d 1785, 1791 (T.T.A.B. 2008) ("a product may be found to originate from a place, even though the product is manufactured elsewhere")).) But, according to the reasoning of the District Court, regardless of whether one considered geographic origin as simply a question of where something is made or, instead, took the broader "heritage" approach to the question of geographic origin, Pernod's claim failed, and it did so for reasons that made survey evidence irrelevant.

15

As to the place of manufacture, the Court was persuaded that "[t]he Havana Club label clearly and truthfully provides the origin of defendant's rum, and is not deceptive." (App. at 23.) The label proclaims the contents of the bottle to be "Puerto Rican Rum" and specifically says the rum is "distilled and crafted in Puerto Rico[.]" (App. at 12.) The District Court saw no room for deception in that.[9] Quoting the decision of the United States Court of Appeals for the Seventh Circuit in *Mead Johnson & Co. v. Abbott Labs.*, 201 F.3d 883, 886 (7th Cir. 2000), *amended on denial of reh'g*, 209 F.3d 1032 (7th Cir. 2000) (per curium),[10] the District Court said, "survey research does not determine the meaning of words or 'set the standard to which objectively verifiable claims must be held.'" (App. at 23.)

Turning to the question of heritage, the Court declared that "Havana Club rum has a Cuban heritage and, therefore, depicting such a heritage is not deceptive." (App. at 24.) Under this broader interpretation of the term "geographic origin," Pernod's survey evidence was necessarily irrelevant, in the Court's view, because Bacardi should have a First Amendment right "to accurately portray where its rum was historically made – as opposed to claiming that the product is still made there." (*Id.* at 25.) The Court found it particularly

---

[9]The Court found it persuasive that "the federal agency charged with monitoring consumer deception in labeling" alcohol, the TTB, approved Bacardi's use of the "Havana Club" label. (App. at 23.)

[10]The District Court relied upon the unamended opinion but cited portions of the opinion that were untouched by the later amendments.

16

important that Bacardi's Havana Club rum is based on the Arechabala family's original Havana Club recipe.

While we may not agree with every aspect of the foregoing analysis,[11] we are persuaded that the District Court's carefully reasoned opinion reaches the right result on the particular facts of this case. More specifically, we conclude, as did the District Court, that the Havana Club label, taken as a whole, could not mislead any reasonable consumer about where Bacardi's rum is made, which means that survey evidence has no helpful part to play on the

---

[11]We question whether the District Court should have endeavored to use the modifier "geographic" to expand the meaning of "origin" into the realm of history, heritage, and culture. *See Dastar*, 539 U.S. at 38 (stating that a claim for false advertising relating to the authenticity of a good would fall under the "'misrepresents the nature, characteristics [or] qualities' provision of § 43(a)(1)(B)"). As the Court itself observed, applying the Supreme Court's interpretation of the word "origin" from *Dastar* may lead more naturally to an understanding of "geographic origin" as implicating the place of a product's manufacture, not a broad inquiry into the product's background, *see id.* at 29-32, 37 (clarifying that the term "origin" as used in § 43(a)(1)(A) encompasses both the geographic location in which the "tangible product sold in the marketplace" was produced and the "producer of the tangible goods that are offered for sale" but does not incorporate "the author of any idea, concept, or communication embodied in those goods"). However, whether "origin" acquires a broader rather than a narrower meaning when the adjective "geographic" is placed before it is not something we need to decide now.

17

question of what the label communicates regarding geographic origin.

The central conceptual problem before us is whether language can be clear enough that its meaning is beyond reasonable dispute. Pernod is of course correct that the issue in false advertising cases is "whether an advertisement, like [Bacardi's] label, implies an inaccurate message … ." (Appellant's Op'g Br. at 30.) That is somewhat of a tautology, but Pernod's choice of the word "implies" is apt because it rightly indicates that the words themselves have meaning beyond the subjective inferences of any individual reader or listener. Words, malleable though they may be over time, must still, of necessity, be repositories of commonly accepted meaning at any given point in time. Were it otherwise, ordinary discourse would be impossible.

While they lack the precision of numbers, words must, as nearly as possible, be accorded an objectively reasonable meaning if law is to have any fair claim as an instrument of justice. Proof of that is found throughout the law. *See, e.g.*, *Wilson v. Quadramed Corp.*, 225 F.3d 350, 354-55 (3d Cir. 2000) (holding that we read the Federal Debt Collection Practices Act to protect the "least sophisticated consumer," which includes the "gullible as well as the shrewd," because the Act is a consumer protection law, but we "preserv[e] a quotient of reasonableness and presum[e] a basic level of understanding and willingness to read with care" (quoting *United States v. Nat'l Fin. Servs.*, *Inc.*, 98 F.3d 131, 136 (4th Cir. 1996)) (internal quotation marks omitted)); *Victor v. Nebraska*, 511 U.S. 1, 29 (1994) ("When reviewing a jury instruction that defines 'reasonable doubt,' it is necessary to consider the instruction as a whole and to give the words their

common and ordinary meaning." (citing *Estelle v. McGuire*, 502 U.S. 62, 72 (1991))); *Old Colony R.R. v. Comm'r,* 284 U.S. 552, 560 (1932) (in interpreting statutory language, "the plain, obvious and rational meaning of a statute is always to be preferred to any curious, narrow, hidden sense") (internal quotation marks omitted); *Karedes v. Ackerley Grp., Inc.*, 423 F.3d 107, 113-14 (2d Cir. 2005) ("[C]ourts must give the disputed language a fair reading in the context of the publication as a whole. Challenged statements are not to be read in isolation, but must be perused as the average reader would against the whole apparent scope and intent of the writing" and that "[i]t is the meaning *reasonably attributable* to the intended reader that controls." (emphasis added and removed)); *Hatfill v. New York Times Co.*, 416 F.3d 320, 333 (4th Cir. 2005) (applying a "reasonable reader" standard under Virginia law to a motion to dismiss a defamation claim); *Temme v. Bemis Co.*, 622 F.3d 730, 734 (7th Cir. 2010) ("A contract's meaning is a matter of law; where there is no contractual ambiguity, there is no need for extrinsic evidence and no factual dispute that precludes summary judgment. When interpreting contracts, terms are given their 'ordinary and popular' meaning … ." (internal citations omitted)); *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 36-38 (1987) (arbitrator applying collective bargaining agreement cannot ignore the plain language of the contract).

While most of these examples are from areas of law that do not require, as does the law of false advertising, a studied effort to understand what words mean from the perspective of members of the consuming public, they do show that there is and must be a point at which language is used plainly enough that the question ceases to be "what does

19

this mean" and becomes instead "now that it is clear what this means, what is the legal consequence."

The *Mead Johnson* decision demonstrates the principle. In that case, the Seventh Circuit considered whether the phrase "1st Choice of Doctors" could be misleading. The court acknowledged that, in the context of a false advertising case, "whether a claim is 'false' or 'misleading' is an issue of fact rather than law[,]" but it went on to say that "[t]he sort of survey evidence Mead Johnson gathered would not support a conclusion by a reasonable person that Abbott's claim was false or implied a falsehood." *Mead Johnson*, 209 F.3d at 1034 (reciting language added to 201 F.3d 883, 886-87). Recognizing that there is a baseline meaning to some words that put them beyond any credible claim of misunderstanding, the Seventh Circuit said, "never before has survey research been used to determine the meaning of words, or to set the standard to which objectively verifiable claims must be held." *Mead Johnson,* 201 F.3d at 886.

Though the *Mead Johnson* opinion is not without its detractors, *see* Rebecca Tushnet, *Running the Gamut from A to B: Federal Trademark and False Advertising Law*, 159 U. PA. L. REV. 1305, 1319 n.54 (2011) (hereafter "Tushnet"), we agree with its general proposition that there are circumstances under which the meaning of a factually accurate and facially unambiguous statement is not open to attack through a consumer survey. In other words, there may be cases, and this is one, in which a court can properly say that no reasonable person could be misled by the advertisement in

20

question.[12] *Cf. Mead Johnson*, 201 F.3d at 884 (survey evidence is inappropriate when "it is all but impossible to call the [advertising] claim [at issue] misleading").

Here, there is a factually accurate, unambiguous statement of the geographic origin of Havana Club rum. The label clearly states on the front that the liquor is "Puerto Rican Rum" and, on the back, that it is "distilled and crafted in Puerto Rico." No reasonable consumer could be misled by those statements, and the rest of the label does not put those statements in doubt.[13] Pernod counters, however, that the

---

[12]It has been said in recent, thoughtful, academic commentary that, in a false advertising case, consumer survey evidence should not be necessary to demonstrate consumer confusion if that confusion would be clear, i.e., "when other factors strongly favor a finding of likely confusion." Tushnet at 1339 (noting that "[w]hen a consumer is likely to receive a false message, a court should be able to act even without a survey in hand"). While the parallel is not perfect, it is similarly appropriate to conclude that a consumer survey should not be necessary or dispositive when it is plain from an advertisement that rational confusion is not possible. A logical conclusion, and one we reach here, is that if "[c]ourts should be more willing to use common sense in finding deceptiveness," *id.* at 1343, they should likewise be prepared to use common sense to conclude that an advertisement, when taken as a whole, could not mislead a rational consumer.

[13]We do not, nor need we, address the situation in which the statement of the geographic origin in an advertisement is contained in fine print. The portions of the label that put the meaning of the advertisement beyond reasonable dispute here are plainly legible. Moreover, the

21

words "Havana Club" are misleading as to the geographic origin of the rum. If we were dealing with those words in isolation, we might agree. There are administrative decisions that do.[14] *See Corporacion Habanos,* 88 U.S.P.Q. 2d at 1791 (holding that the trademark "Havana Club" was primarily geographically deceptively misdescriptive when used on cigars not produced in Cuba); *In re Bacardi*, 48 U.S.P.Q. 2d at 1034-35 (affirming denial of registration to Bacardi for use of the trademarks "Havana Select," "Habana Clasico," "Old Havana," "Havana Primo," and "Havana Clipper," in connection with the sale of rum because the marks were "primarily geographically deceptively misdescriptive … because purchasers' belief that the rum products … originate in HAVANA, Cuba, is a mistaken belief").

---

phrase "Puerto Rican Rum" is particularly prominent on the front of the bottle.

[14]The challenged phrase is not a patently unambiguous false statement of geographic origin like "Cuban Rum," "Havana Rum," or "Rum of Havana." Such was the case in *H.N. Heusner & Son v. Federal Trade Commission*, 106 F.2d 596 (3d Cir. 1939), and *El Moro Cigar Co. v. Federal Trade Commission*, 107 F.2d 429 (4th Cir. 1939). *See also Heusner*, 106 F.2d at 597-98 (affirming a decision by the Federal Trade Commission to bar the use of the "totally false" brand name "Havana Smokers" on cigars made in the United States with United States tobacco); *El Moro*, 107 F.2d at 430-32 (affirming FTC order barring the use of "Havana Counts" for falsely implying that cigars were of Cuban origin).

But, as we have already emphasized, we are not dealing with those words in isolation. This is not a trademark case, and certainly not one addressing trademark registration, no matter how much Pernod may wish it were. We are obligated in this false advertising case under § 43(a)(1)(B) to look at the words "Havana Club" in the context of the entire accused advertisement, the label of the rum.[15] *See, e.g.*, *Am. Italian Pasta Co. v. New World Pasta Co.*, 371 F.3d 387, 392-93 (8th Cir. 2004) (considering the phrase "America's Favorite Pasta" in context of the product's whole packaging); *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 946 (3d Cir. 1993) (holding that it is appropriate to "analyze the message conveyed in full context"); *Forschner Grp., Inc. v. Arrow Trading Co.*, 30 F.3d 348, 355 (holding that the whole challenged advertisement must be considered); *Sandoz Pharm. Corp. v. Richardson-Vicks, Inc.*, 735 F. Supp. 597, 600 (D. Del. 1989), *aff'd*, 902 F.2d 222 (3d Cir. 1990) (same); *cf. Scotch Whiskey Ass'n v. Consol. Distilled Prods., Inc.*, 210 U.S.P.Q. 639, 642-45 (N.D. Ill. 1981) (considering the phrase "LOCH-A-MOOR" in context of the whole bottle of whiskey on which it was used). And viewed in that context, any thought a consumer might have that the words "Havana Club" indicate the geographic origin of the rum must certainly be dispelled by the plain and explicit statements of geographic origin on the label.

---

[15]Pernod evidently concedes, as it must, that considering the whole Bacardi rum bottle is appropriate here, as the survey it conducted considered the whole Bacardi rum bottle.

Put another way, even if the words "Havana Club," taken in isolation, may be understood as indicating a product's geographic origin in Havana, Cuba, those same words cannot mislead a reasonable consumer who is told in no uncertain terms that "Havana Club" is a brand of rum made in Puerto Rico. *Cf. Am. Italian Pasta*, 371 F.3d at 392-93 (holding that the phrase "America's Favorite Pasta" in context of the product's whole packaging was not an actionable statement under § 43(a)(1)(B)); *Mead Johnson*, 209 F.3d at 1034 (adding language to 201 F.3d 883) (holding a reasonable person would not interpret the phrase "1st Choice of Doctors" to be false or imply a falsehood even in light of survey evidence to the contrary); *Forschner*, 30 F.3d at 352, 354-56 (holding that the phrase "Swiss Army knife" when used in conjunction with the statement "Made in China" to describe a multifunction knife was not a false advertisement under § 43(a)(1)(B) as a matter of law because it did not "lend[] itself to being construed as a statement of geographic origin" even though "roughly 40% of the relevant public believe[d] [mistakenly] that a Swiss Army knife is manufactured in Switzerland"); *Hamilton-Brown Shoe Co. v. Wolf Bros. & Co.*, 240 U.S. 251, 256-57 (1916) (holding that, as a matter of law, a trademark used on shoes, "The American Girl," was not a "geographical or descriptive term").

Under these circumstances, a district court can properly disregard survey evidence as immaterial, because, by definition, § 43(a)(1) does not forbid language that reasonable people would have to acknowledge is not false or misleading.[16]   *Cf.* 15 U.S.C. § 1125(a)(1) (Lanham Act

---

[16]This is not an assertion that literally truthful claims cannot be misleading and therefore cannot be actionable. *See*

24

*Novartis,* 290 F.3d at 586, 588-90; *Rhone-Poulenc Rorer*, 19 F.3d at 129-31; *cf.* Tushnet, at 1319-20 (citing *Mead Johnson* for the proposition that "[f]alse advertising doctrine has … occasionally flirted with the idea that truthful claims simply can't be misleading"). It is rather an acknowledgement that false advertising claims occupy no special niche separating them from the standard rule that, once something – for example the meaning of text – is beyond reasonable dispute, there is no longer a question of fact; there is only the question of how the law applies to established fact. That conclusion is consistent with our holdings that what matters in false advertising cases is "the message that is conveyed to consumers." *Rhone-Poulenc Rorer*, 19 F.3d at 129. As we have held, "[t]he probative value of a consumer survey is a highly fact-specific determination and a court may place such weight on survey evidence as it deems appropriate." *Id.* at 134 (internal quotation marks omitted). A consumer survey does not trump the district court's role as arbiter of the reliability and trustworthiness of expert and hearsay evidence based upon statements of consumers reacting to an advertisement. Judge Lasker, who coined the now widely-accepted proposition that "the court's reaction [to an advertisement] is at best not determinative and at worst irrelevant" in *American Brands, Inc. v. R.J. Reynolds Tobacco Co.*, 413 F.Supp. 1352, 1356-57 (S.D.N.Y. 1976), observed that:

> [W]here, as here, the issue is whether true statements are misleading or deceptive despite their truthfulness, … [t]hough the court's own reaction to the advertisements is not determinative, as finder of fact it is obliged to judge for itself whether the evidence of record

§ 43(a)(1), forbidding "any false designation of origin, false or misleading description of fact, or false or misleading representation of fact"). A contrary holding would not only be out of keeping with the language of § 43(a)(1), it would undermine the purpose of subsection (a)(1)(B) by subjecting advertisers to a level of risk at odds with consumer protection.[17] *Cf. Mead Johnson*, 201 F.3d at 886 (drawing a

> establishes that others are likely to be misled or confused. In doing so, the court must, of course, rely on its own experience and understanding of human nature in drawing reasonable inferences about the reactions of consumers to the challenged advertising.

*McNeilab, Inc. v. Am. Home Prods. Corp.*, 501 F. Supp. 517, 525 (S.D.N.Y. 1980). We would add that, when the meaning of words is beyond all reasonable dispute, there is no issue of fact on the question of meaning.

[17]The conclusion that advertising text can be clear enough that it simply cannot be challenged as misleading is also consistent with numerous cases holding that puffery can be so obviously exaggerated that even credulous consumers cannot be misled. *See, e.g.*, *Am. Italian Pasta*, 371 F.3d at 389-90, 392-93 (holding that puffery, including "exaggerated statements of bluster or boast upon which no reasonable consumer would rely" are non-actionable statements under § 43(a)(1)(B)); *United States Healthcare,* 898 F.2d at 922 ("Mere puffing, advertising that is not deceptive for no one would rely on its exaggerated claims, is not actionable under § 43(a)." (internal quotation marks and citations omitted)); *Marriott Corp. v. Ramada Inc.*, 826 F. Supp. 726, 728 (S.D.N.Y. 1993) (dismissing false advertising claim because ad was an obvious parody and one that no "reasonable person

distinction between misleading statements and statements which may be subject to misunderstanding: "Section 43(a)(1) forbids misleading as well as false claims, but interpreting 'misleading' to include factual propositions that are susceptible to misunderstanding would make consumers as a whole worse off by suppressing truthful statements that will help many of them find superior products.").

We hasten to add that cases like the present one should be rare, for one hopes that a case with truly plain language will seldom seem worth the time and expense of contesting in court. That this particular case, and related ones, have been litigated so intensely is due, it seems, to the unusual political baggage and branding potential involved. A word of caution is nevertheless in order, so that our holding today is not taken as license to lightly disregard survey evidence about consumer reactions to challenged advertisements. Before a defendant or a district judge decides that an advertisement could not mislead a reasonable person, serious care must be exercised to avoid the temptation of thinking, "my way of seeing this is naturally the only reasonable way." Thoughtful reflection on potential ambiguities in an advertisement, which can be revealed by surveys and will certainly be pointed out by plaintiffs, will regularly make it the wisest course to consider survey evidence.[18]

would be misled – even absent the disclaimer – into believing"); *cf. Reilly v. Pinkus*, 338 U.S. 269, 274 (1949) (stating that puffery in advertisements goes too far if "credulous persons" rely on it as a material representation of fact).

[18]Again, a district court's decision to disregard survey evidence is reviewable de novo, since it is founded on a legal

conclusion based on underlying facts, that is that no reasonable consumer would be misled by an advertisement. Here, that the bottle contains, as the District Court found, an unambiguous, prominent statement of origin and another statement which, when taken in isolation, could be seen as an ambiguous reference to a geographic locale are points of fact. Application of those facts to the ultimate question of whether a reasonable consumer would be confused is a matter of law and, thus, requires no consideration of survey evidence. That rule is consistent with other areas of the law concerning issues of mixed questions of law and fact when a district court plays no unique role in determining the underlying facts. *See, e.g.*, *Ornelas v. United States*, 517 U.S. 690, 697 (1996) (holding that the "ultimate determinations of reasonable suspicion and probable cause" are subject to *de novo* review); *Salve Regina Coll. v. Russell*, 499 U.S. 225, 231 (1991) ("Independent appellate review of legal issues best serves the dual goals of doctrinal coherence and economy of judicial administration."); *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 685-686 (1989) (holding that "[t]he question whether the evidence in the record in a defamation case is sufficient to support a finding of actual malice is a question of law" which requires a "case-by-case adjudication" even though it involves some factual inquiries); *cf. Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 401-02 (holding that deferential review is appropriate when "the district court is better situated than the court of appeals to marshal the pertinent facts and apply [] fact-dependent legal standard[s]" which rely on such determinations by district courts such as those "[i]ssues involving credibility"); *see also Microsoft Corp. v. i4i Ltd. P'ship*, --- S.Ct. ----, 2011 WL 2224428, *12 (June 9, 2011) (Breyer, J., concurring)

28

Finally, we emphasize once more that our conclusion in this case says nothing of whether the words "Havana Club" are eligible for registration as a trademark. The word "Havana" carries a long legal history in trademark cases. *See Corporacion Habanos*, 88 U.S.P.Q. 2d at 1791 (holding that the trademark "Havana Club" was primarily geographically deceptively misdescriptive when used on cigars not produced in Cuba); *In re Bacardi.*, 48 U.S.P.Q. 2d at 1035 (affirming denial of registration to Bacardi for use of the trademarks "Havana Select," "Habana Clasico," "Old Havana," "Havana Primo," and "Havana Clipper," in connection with the sale of rum because the marks were "primarily geographically deceptively misdescriptive … because purchasers' belief that the rum products … originate in HAVANA, Cuba, is a mistaken belief"). Agency decisions regarding the registration of trademarks look at the words of the mark in isolation and do not consider them in the context of a whole advertisement in which they are used. *See In re Budge Mfg. Co., Inc.*, 857 F.2d 773, 776 (Fed. Cir. 1988) (holding with respect to a clarifying statement made in advertising which the trademark applicant argued negated the misleading nature of the mark, "This argument is beside the

---

(discussing how the "ultimate question of patent validity turns on the correct answers to legal questions" which depends on "how the law applies to facts as given"); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (holding that the question regarding disposition of a case by summary judgment as a matter of law is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party").

issue. It is the word of the mark, not the statement of an advertising circular which appellant seeks to register...." (quoting *In re Bonide Chemical Co.,* 46 F.2d 705, 708 (C.C.P.A. 1931))). Hence, such decisions do not address the circumstances we have dealt with here, nor does our decision turn on the issues determinative in a registration case.[19]

---

[19]Similarly, the other cases to which Pernod points are inapposite because their facts are clearly distinguishable. *See*, *e.g.*, *Scotch Whiskey Ass'n*, 210 U.S.P.Q. at 641-45 (enjoining the sale of "LOCH-A-MOOR" whiskey under the Lanham Act because of the false implication that the origin of the whisky was Scotland, even though the whiskey was "made with 100 percent imported Scotch whiskies," when the whiskey's label disclosed in "small print that Loch-A-Moor is a domestic product"); *Black Hills Jewelry Mfg. Co. v. Gold Rush, Inc.*, 633 F.2d 746, 752-53 (8th Cir. 1980) (affirming injunction under the Lanham Act to prevent the use of "Black Hills" on jewelry not manufactured in South Dakota's Black Hills region); *Scotch Whiskey Ass'n v. Barton Distilling Co.*, 338 F. Supp. 595, 598-99 (N.D. Ill. 1971), *aff'd and rev'd in part*, 489 F.2d 809 (7th Cir. 1973) (holding that a label using the phrase "Blended Scotch Whiskey" to identify a whiskey that included spirits not produced in Scotland was a false designation of geographic origin under the Lanham Act); *Grand Rapids Furniture Co. v. FTC*, 134 F.2d 332 (3d Cir. 1943) (affirming Federal Trade Commission ("FTC") order barring the use of "Grand Rapids" for falsely implying that the furniture was made in Grand Rapids, Michigan). None of those cases dealt, as we do here, with a challenge to a statement in an advertisement that could be seen as ambiguously referencing the geographic origin of a product if

## III. Conclusion

Because the phrase "Havana Club" is not a misleading statement of geographic origin under § 43(a)(1)(B) of the Lanham Act when considered in the context of Bacardi's rum label, the District Court was not required to consider Pernod's survey evidence. We will therefore affirm the judgment of the District Court.[20]

---

read in isolation but could not be so seen if the phrase is taken in the context of the whole advertisement.

[20]Given our holding that the Bacardi label does not violate the false advertising provision of the Lanham Act, we do not address the District Court's comments regarding whether First Amendment rights allowed Bacardi to use the phrase "Havana Club." Furthermore, our holding would not, in theory, foreclose any action against Bacardi under § 43(a)(1)(A) of the Lanham Act premised on Bacardi's infringement of a hypothetical unregistered trademark of "Havana Club." *See Forschner*, 30 F.3d at 352. Unlike the plaintiffs in *Forschner*, however, Pernod does not sell a product in the United States labeled with the challenged phrase and brought its claim solely under § 43(a)(1)(B) of the Lanham Act.